## Lorenzo H. Cone, Appellant, *v.* Frank J. St. John, William Hill and Frank T. Patterson.

*Equity—Evidence—Trust—Parol evidence varying written instrument—Patent.*

J. the owner of a patent assigned one half interest in it to his son C., and the other half to S. Subsequently J. applied for a patent for an improvement upon this patented article. The patent was issued after his death, and C. as executor assigned the patent to S. Subsequently C. filed a bill in equity against S., averring that one half of the second patent belonged to him, and that the assignment had been made under an agreement that S. would reassign to C. a one half interest in the second patent. S. denied that C. had any interest in the patent, and averred that J. had taken out the patent for S. alone, and that S. was the equitable owner of it at the time of J.'s death. The solicitor who had taken out the patent testified that it was taken out for S. There was in evidence declarations of J. that the patent belonged to C. and S., but some of these declarations were applicable to the first patent. For five years after the assignment S. held himself out as the absolute owner of the patent. C. testified that he had made constant demands for a reassignment, but S. denied that any such

demands had been made upon him. *Held*, that the master's finding that C. had no interest in the patent, confirmed by the court below, would not be reversed by the Supreme Court.

Argued Jan. 6, 1897. Appeal, No. 322, Jan. T., 1896, by plaintiff, from decree of C. P. No. 1, Phila. Co., March Term, 1893, No. 910, dismissing bill in equity. Before Sterrett, C. J., Green, Williams, McCollum, Mitchell, Dean and Fell, JJ. Affirmed.

Bill in equity to compel the assignment of a half interest in a patent.

The bill averred that Jonathan Cone, the father of Lorenzo H. Cone, the plaintiff, was the owner of letters patent No. 380,312 for an improved grate bar; that before he had received the letters patent therefor he gave the same to his son, the plaintiff, and to Frank J. St. John, the defendant, in equal shares, the son's one half share being given in consideration of natural love and affection, and St. John's being in consideration of the services which he was to render in procuring a market for the patented article.

That Jonathan Cone died before the letters patent 380,312 were issued, and that his executors, Lorenzo H. Cone, the plaintiff, and Rebecca C. Cone, executed an assignment of the said letters patent to the defendant St. John on April 23, 1888, for the purpose of giving effect to the intention of Jonathan Cone that plaintiff and defendant should each have one half of said letters patent. That it was agreed and understood by the parties to the assignment that St. John, the defendant, should take the title in his own name to avoid the supposed awkwardness of the plaintiff as executor conveying title to himself, and that under this agreement St. John was to hold the title conveyed by the assignment one half for the benefit of Lorenzo H. Cone, the plaintiff, and was to convey it to him when requested.

That the defendant never did so assign plaintiff's half, although often requested to do so.

That subsequently the defendant, St. John, on April 8, 1890, executed an assignment of said patent to William Hill and Frank T. Patterson, the other two defendants, for the consideration of $1.00; that this assignment was merely a cover to assist defendant in depriving plaintiff of his title. The bill

prayed (1) for a decree to establish the rights of the parties; (2) for injunction to prevent any of defendants dealing with the title to the patent so as to affect the rights of plaintiff; (3) for a deed of assignment of one half the patent; (4) account; (5) further relief.

The defendants filed separate answers.

Frank J. St. John by his answer denied that Jonathan Cone had given the patent to the plaintiff and himself in equal shares, but averred that he (St. John) was the equitable owner of the patent at the time of Jonathan Cone's death; that " for certain good and valuable considerations " Jonathan Cone held the patent for his (St. John's) benefit.

While admitting the execution of assignment of April 23, 1888, to himself, he denied that it was with the understanding that half of the patent should belong to plaintiff, and averred that it was made because he was the equitable owner of the patent.

He admitted assignment to Hill and Patterson of April 8, 1890, but averred that it was as collateral security for a debt of $2,309.09, and was not made in fraud of plaintiff's rights. Hill and Patterson by their answers admitted the facts of assignments, etc., set forth by plaintiff's bill, but denied all knowledge of the averments relating to the agreement between St. John and the plaintiff; they averred that the assignment to themselves was bona fide to secure a debt of $2,309.09, and not as a cover to deprive plaintiff of any title he might have.

The replication was in the common form.

The case was referred to William C. Ferguson, Esq., as master who reported in part as follows:

There are certain facts in the case that are uncontradicted. Captain Jonathan Cone, a person well known in connection with river steamboats in Philadelphia, in his lifetime invented a certain furnace grate bar, adapted for general furnace use, but particularly for steam vessels. Letters patent on this invention were issued to him by the United States patent office under date of February 8, 1870. Captain Cone introduced this grate bar into a steamer or steamers in which he was interested, but does not appear to have made much of an effort to advertise or spread knowledge of its merits, if merit it had.

There had existed between Lorenzo H. Cone, the plaintiff, the son of Jonathan Cone, and Frank J. St. John, the defendant, a warm and confidential friendship for a period of years beginning in 1880. They were much of the time together at their homes and elsewhere, and plaintiff became acquainted with his wife through his intimacy with defendant and defendant's wife.

In April, 1886, Jonathan Cone assigned the patent for the grate bar to his son, Lorenzo H. Cone and Frank J. St. John in equal shares. It is practically admitted that an interest was given to St. John for the purpose of having him perform the greater part of the work in advertising and introducing the bar into general use.

On February 28, 1887 (the old patent then expired or about expiring), Jonathan Cone made application to the United States patent office for another patent on a furnace grate bar. It is the ownership of this patent which is in controversy. Letters patent on this bar were issued under date of April 3, 1888, in the name of Jonathan Cone. In the meantime, Jonathan Cone, on October 10, 1887, had died. Immediately after the receipt of the letters patent, Lorenzo H. Cone and Rebecca C. Cone, executors of Jonathan Cone, by formal assignment dated April 23, 1888, assigned the said patent to Frank J. St. John. From the date of the assignment of the second patent to January 1, 1893, the plaintiff and defendant continued in their intimate and friendly relationship. St. John had entire control and management of the business of the grate bar, and during that time the plaintiff knew nothing definite of the progress, if any, that St. John was making. He never received a statement of the business or any of the proceeds thereof. The wife of defendant had died in September, 1890, and about January 1, 1893, the defendant had either married again or was about to do so, and the plaintiff and defendant had a serious disagreement at the time as to the proper management of defendant's child, the merits of which dispute having no connection with the case. Though of no importance as to its merits, it is easily conceived how on such a subject, if firmness was displayed on both sides, a wide breach could readily result. It happened so in this case, and the feelings engendered became bitter, as they are only too apt to become, between old and tried friends when an incurable

breach occurs between them. This feeling was doubtless imparted to intimates on both sides, and it is not difficult to imagine that in a litigation between two such persons, the evidence of partisans would be colored with prejudice. As above mentioned, this disagreement happened on January 1, 1893. On March 21, 1893, the plaintiff demanded of defendant a full accounting of the affairs of the second grate bar and an assignment to him of a half interest therein. The fact that the plaintiff and defendant together owned a patent for a grate bar given to them by Jonathan Cone in 1886, which patent expired in 1887, and that Jonathan Cone at once applied for another patent, which now is in the possession of the defendant, adds presumptive strength to the plaintiff's case. It, however, served to mislead the witnesses very much, for they testified concerning conversations made, in which "the grate bar" was mentioned, without a clear comprehension of the fact that there had been two patents, and frequently by their testimony showing conclusively that the first patent was the one they had in mind.

The plaintiff's claim is substantially that the second patent was applied for by his father, Jonathan Cone, for the benefit of himself (Lorenzo H. Cone) and defendant; that the patent was received in the name of Jonathan Cone, after his death; that the patent was assigned by plaintiff and his mother, as executors of Jonathan Cone, to defendant, with the understanding that defendant was to reassign to plaintiff a half interest therein; and that defendant refused to so reassign upon the request of plaintiff.

There are three important divisions of the evidence: First, as to the acts and declarations of Jonathan Cone in his lifetime; second, the agreement or understanding between the plaintiff and defendant at the time of the execution and delivery of the assignment; and third, the admissions and declarations of the parties since the assignment. Under the first division, it is admitted as a fact that Jonathan Cone presented the first patent to the two young men. It presumably had little value, for there was no evidence of any great success that Jonathan Cone had with it in the sixteen years of his ownership, and the young men certainly fared no better. Unfortunately, Jonathan Cone is dead, and cannot now enlighten us as to what was said and

done by him with regard to the second patent, so far as the plaintiff and defendant are concerned. The plaintiff can give us very little evidence. He states (on page 4 of the printed testimony) that when his father applied for the second patent, the understanding between the three of them was that the new patent was to stand in the same relationship and ownership as the old one. On page 12, he states, on cross-examination, that his father said that he would get up another bar and give it to plaintiff and defendant. Plaintiff plainly showed by his evidence that he knew very little about this second patent, except the fact that an application had been made for it. He knew nothing about the plans or work that had been done on it, and was in entire ignorance on the subject, except to the bare fact of the intended application. There was no person present on any occasion mentioned except defendant and himself, and there was no person who testified as to anything said by Captain Cone to these two men or either of them concerning this second patent.

Mrs. Rebecca C. Cone plaintiff's mother, testified that in May, 1887, her husband told her he had an improved patent grate bar which he intended for the plaintiff and defendant. Also, in the summer of that year, he expressed surprise that he had not received the patent for the grate bar, saying he intended it for the plaintiff and defendant. Witness then asked him why he should give a half interest to defendant, "a comparative stranger," and Cone replied that it was in substance compensation for the trouble defendant would be put to in working the patent up. Mrs. Cone's testimony was clearly given and remained unshaken, and but one comment can be made on it, and that is in the fact that she twice spoke of St. John on that day as a comparative stranger. This is perhaps an illustration of the extent to which the feeling of the witness, at the time of testifying, colored the words which she quoted. Defendant was not at that time a comparative stranger. He was an intimate friend of her son, of many years' standing, so much so that he sat up with Captain Cone when he was sick, and on the night on which he died, and therefore must have been a frequent visitor at her home. Thomas McNamara heard Captain Cone say in 1885 or 1886, to St. John, "See what you can do with it," meaning the bar. This certainly referred to the first patent.

J. Henry Edmunds, a gentleman who was a very intimate friend of Captain Cone and the representative of his interests at Cape May, testified that, in the summer of 1887, he heard Captain Cone say he wanted to go to Washington about a patent grate bar; that he had given it to plaintiff and defendant, and some day they would make a great deal of money out of it. The witness only knew of one patent, which the captain had given to the two young men, and had heard him speak of it often several years before.

To oppose these witnesses defendant testifies that, in the fall of 1886, he told Captain Cone that he was getting up drawings for a new bar. He replied, "So am I; if you will give me your drawings I will pick out the good qualities and get it patented for you in my name," etc. (Page 57.) Defendant did so. He saw Mr. Hunter, the patent solicitor, with Captain Cone, about the application many times; that plaintiff told defendant (page 58) that he knew his father was getting out the patent for defendant; that there was never any understanding, express or implied, that the new patent was to be held by himself and plaintiff, and that plaintiff never had any interest in the second patent; that he knew the captain went to Washington in reference to obtaining an act of congress for a side-light patent, and never heard of his going to Washington in reference to the grate bar. Rudolph M. Hunter, the solicitor who obtained the patent, gave what is, to the mind of the master, the most valuable evidence of statements made by Captain Cone. He stated that the patent was applied for by Captain Cone for the benefit of defendant; that Captain Cone so stated to him; that he did not know that Captain Cone had a son until after the patent issued; that Captain Cone had no occasion to go to Washington in reference to the application, and he did not think Captain Cone ever went to the patent office in reference to this patent, and he knows that he never stated that he did. . . .

We have, then, admitting it all, the evidence of the plaintiff and defendant, absolutely contradicting each other, and that of Mrs. Cone and Mr. Edmunds as to certain loose declarations made by Captain Cone, in which, particularly in the case of Mr. Edmunds, it is not certain that the first patent is not referred to, contradicted by Mr. Hunter. All the conversations took place more than six years before the testimony. How

could such evidence alter an existing absolute estate? If, for the sake of argument, we assume that Captain Cone had the patent in his possession, and had formally assigned it to St. John in his lifetime, could it be argued that the evidence just considered would be sufficient to establish a trust imposed by him in St. John for his son for one half the patent? The master thinks not.

Either admitting or excluding all this evidence, the master is of opinion that the evidence does not disclose a parol gift of this patent to the plaintiff and defendant, and if the evidence of Mr. Hunter is to be admitted, it absolutely disposes of the plaintiff's claim. For, as has been suggested by counsel for the defendant, if the plaintiff fails on this branch of the case, he fails altogether. If the patent was applied for by Captain Cone for the benefit of the defendant, the name used in the application was of small importance, since the rightful ownership was subsequently confirmed by the formal assignment of the plaintiff and his mother as executors of Captain Cone. . . .

In considering the second division of the evidence, the case of the plaintiff is even more weak.

The defendant, who appears to have been the person most interested, obtained the patent as soon as it was received, from Mr. Hunter, and took it to plaintiff, stating, as he testifies, that life was uncertain and he would like to have it assigned to him, which plaintiff assented to. An assignment was prepared by Mr. Hunter at the instance of defendant, and taken to plaintiff, who had it duly executed by his mother and himself, and it was delivered to the defendant. Plaintiff says the assignment was made at his own suggestion, because he did not want the patent to become involved in his father's estate, which was pretty well " mixed." He says they assigned to the defendant, and defendant was to reassign one half to him, as he did not want to take title as executor, probably meaning take title from himself as executor. It was an unusual reason for a layman to give, and such prudence would seemingly suggest the necessity for a contemporaneous reassignment, or an assignment to the two, through the medium of a third party, but the question of a reassignment does not appear to have given the plaintiff at this time any concern whatever. No mention was made at that time

of a formal reassignment, and no promise was made by defendant to reassign. The mother was not present at the time of these conversations nor at the time of the delivery of the assignment. Plaintiff did not direct the preparation of a reassignment to him, or express any surprise that one was not produced with the first one. Defendant denies the plaintiff's story, and says that there was no suggestion of a reassignment, and that the assignment was delivered by plaintiff without any of the reasons he stated concerning his connection with his father's estate, and that the sole reason the patent was assigned to him was because it belonged entirely to him.

Here we have two flat contradictions concerning the facts incident to the delivery of an instrument in writing transferring the ownership of property,—parol evidence of a grantor as to the purport of his grant, denied in toto by the grantee as to every essential fact, and the latter entrenched behind his deed, which is absolutely at variance with the evidence of the grantor. The plaintiff can have no standing in a court of equity with a claim thus supported. And neither this evidence nor all that has gone before it is sufficient to cause a chancellor to move. If it were, the so-called sacredness of written instruments would become a mockery.

We come now to the last branch of the evidence, to wit: that of the declarations of the defendant which the plaintiff contends indicate an acknowledgment on the part of defendant that plaintiff is interested in the patent. This branch of the evidence also includes certain testimony of declarations of defendant at variance with the admitted facts of the case, and also of the declarations and conversations between the plaintiff and defendant since the assignment of the patent, in April, 1888. In order to obtain a comprehension of the various references of the witnesses, the master will set down chronologically, as nearly as he can, the dates of the various events by which the witnesses fix the time of the admissions made. Defendant went to live on Shalfont avenue in the fall of 1885; the first patent was assigned to plaintiff and defendant on April 1, 1886; defendant moved from Shalfont avenue to Spencer terrace in January, 1887, where he lived until 1890; the second patent was applied for February, 1887; Jonathan Cone died October 10, 1887; second patent granted April 3, 1888; assigned

to defendant April 23, 1888; $60 paid by plaintiff to defendant May 23, 1888; plaintiff married Eva Stolz in 1889; Mrs. St. John, defendant's wife, died September, 1890; quarrel between plaintiff and defendant January 1, 1893; formal demand for reassignment March 21, 1893; bill filed June 2, 1893.

In regard to what took place between the parties to the bill, an extraordinary state of affairs is presented. Plaintiff says that at intervals during the ensuing five years he asked the defendant for an assignment of this interest, on an average, once a month—sometimes every day for a while, and then perhaps not for three months, but he gives the impression of a constant series of requests and demands for a reassignment, and a statement of the business done by the defendant. On all these occasions, he testifies, defendant would put him off with a promise or a declaration that he was doing little or nothing with the bar. Defendant replies to this with an absolute denial. He says he was never asked for an assignment or a statement, until after their quarrel in 1893, when plaintiff, in March of that year, made the formal demand already alluded to, and when that was made defendant retorted that plaintiff must be a fool. During this time these men were on the most intimate terms, spending much of their time together, and seeing each other nearly every day, and having friends in common. And herein lies the extraordinary fact. Not one person was produced on either side who ever heard these men speak of the patent to each other, although their friends seemed to know of its existence. No person ever heard plaintiff make a demand on defendant, or heard defendant promise to comply. Even Graham, the friend of both parties, and produced by both, does not speak of any conversation taking place between them concerning the bar until after January 1, 1893. Graham says he was always under the impression that St. John owned the patent, but does not say where he obtained that impression, and while impressions are not evidence, yet in this instance it serves to show that some circumstances caused this man, who was frequently with the two men, to believe that defendant was the owner. And during all these years the plaintiff persisted in his demands, and continued to receive his rebuffs without apparent indignation, and maintained at the same time a warm friendship for defendant. It was a severe test for friendship, to per-

mit a friend to hold one's property and refuse to return it, to see the profits thereof go into that friend's pocket without a complaint, and yet at the same time to have one's regard for that friend remain unshaken; but plaintiff seems, from his evidence, to have been equal to the test, and in all probability the same conditions would have continued until this day, but for the unfortunate quarrel on January 1, 1893, which quarrel had no possible connection with the patent. It may be argued that it was the friendship that prevented a previous break between them over the patent, but the master cannot comprehend how it could have bound them together for so long a time if the circumstances were as plaintiff alleges. Friendship is said to be "a disinterested commerce between equals," and nothing chills the warmth of regard so much as selfishness, trifling, and a disposition to overreach, for these drive out respect and esteem, without which no friendship can long endure. When the defendant positively and unequivocally denies all these statements, it requires no effort on the part of one sitting in the place of a chancellor to disregard them altogether.

We have finally the various declarations of defendant, which, it is contended by plaintiff, constituted declarations of trust in his behalf.

Jonas Stolz, plaintiff's father-in-law, testifies about a certain interview with defendant in New York (the date thereof being uncertain, but witness thought it was after his daughter married plaintiff, but was not positive), in which defendant said Jonathan Cone had given the "original patent" to defendant and plaintiff, and that "Mr. Cone assigned the bar to him on account of the estate, because he did not want it to get mixed up with it, and he gave him the one half part of it," etc. Witness said this conversation had been long ago, and he did not remember the words and did not pay particular attention to it. Mrs. Rebecca Cone, the mother of plaintiff, testified to one occasion in April, 1892, defendant visited her house, and she asked him what he had done with the grate bar "the Captain" gave him one half interest in. He replied that he had not worked it up—there was nothing in it. Also, she said, "We assigned that to you. Have you ever assigned one half to Lenny?" He replied, "Not yet." On another occasion (the time not given), at Shappan Point, she asked him if he had done

anything with it. He replied, "No—there is no money in it." Mrs. Eva Cone, the wife of plaintiff, testified that while visiting defendant's wife in the fall of 1887, when the defendant came home and told his wife that Captain Cone had given the bar to the plaintiff and himself. In 1890 the defendant told her, in reply to a question, not to mind about the grate bar—not to worry over it—that he was going to surprise Len. She also saw in defendant's house some letter-heads marked " Cone's Patent Grate Bar " with plaintiff's and defendant's names. The letter heads were used by Mrs. St. John in her letters to witness. Walter E. Graham, an intimate friend of both parties, went to New York in April, 1892, with defendant, to see plaintiff and his wife off to Europe. While on the steamer, defendant showed him the grate bar and said he owned it. Witness was under that impression before. Defendant told him to say nothing about the bar. He believes he referred to plaintiff.

Defendant produced, in addition to his own evidence, the evidence of Mr. Elwood Davis, who, on one occasion several years before, solicited the work of making the bars from plaintiff, who referred him to defendant, saying that defendant had all to do with it, and it was in his hands altogether. Also William P. Thomas, the secretary of the I. P. Morris Company, testified to manufacturing the bar for defendant, and also that their company had issued a circular with the consent of defendant, advertising the bar and its merits, and mentioning defendant as the owner. Defendant also produced one of these circulars, and also a copy of an advertisement in the Public Ledger of December 18, 1888, in which the merits of the bar are displayed and defendant's name mentioned as owner.

In rebuttal plaintiff produced Caroline Schooley, who testified to having had two or three conversations with defendant within three years prior to her testimony, on which occasions defendant said he had bought out the other interest—Mr. Cone had retired. Walter E. Graham testified that defendant told him he owned the patent, bought for a money consideration. Defendant also said after demand made by plaintiff in March, 1893, that if Len had behaved himself he would have given him a present. Clara Price testified that defendant told her he had paid $50 for the bar. He also cautioned her not to speak of it before plaintiff

Both parties obtained the evidence of Martha E. Keeler, taken under commission to Baltimore, in which she contradicted herself, but in the end, she testified to defendant's speaking of the joint ownership in a grate bar, but, from the time mentioned, it was without doubt the first patent she spoke of. Other witnesses examined gave evidence that was immaterial and of little importance. . . .

There is yet to be considered the circumstance of the $60 paid by plaintiff to defendant on May 23, 1888. Plaintiff says he paid this sum because he was interested in the bar, and hence in the expenses thereof. Defendant says it was a loan. Plaintiff in his testimony says that defendant repeatedly said that the bar was paying its way, and hence it was unnecessary for him to contribute, and yet if that had been the case, plaintiff never demanded the return of the money. And he never seems to have reverted to it again in all his intercourse with the defendant. It will be observed that this money was paid within one month after the assignment, and the circumstance seems to have been entirely overlooked by both parties. Defendant says that they were frequently in the habit of borrowing from each other, and plaintiff does not contradict this in rebuttal. The circumstance, in view of defendant's explanation, cannot be considered of much weight, or of throwing much light on the controversy.

If we now assemble the evidence, we have the plaintiff seeking to break down the defendant's title: (1) by his own testimony, contradicted by defendant; (2) by loose declarations or admissions by defendant, in casual conversations with various witnesses, most of them related to plaintiff or intimate friends and therefore prejudiced, made after a lapse, in most cases of several years.

The defendant defends his title with (1) his deed of assignment, absolute on its face, and without any reservation therein or imposition of any trust; (2) the absence of adequate proof of fraud, accident or mistake in the execution thereof, or of any promise or inducement which obtained its execution, or imposed a trust; (3) the acts of the plaintiff for five years absolutely inconsistent with any trust; (4) the acts of defendant himself in holding himself out in as public a way as possible as the absolute owner of the property; (5) the positive testimony of defendant himself.

The master recommended that the bill should be dismissed.

Exceptions to the master's report were overruled, and a decree entered dismissing the bill.

*Error assigned* was in dismissing the bill.

*T. B. Stork*, with him *W. D. Neilson*, for appellant.—The law of Pennsylvania is without question that when an instrument of writing is executed for a certain purpose a court of equity will interfere to prevent its use for a purpose not contemplated, even although the execution of the instrument is not vitiated by fraud or mistake.    Parke v. Chadwick, 8 W. & S. 96 ; Renshaw v. Gans, 7 Pa. 117 ; Honesdale Glass Co. v. Storms, 125 Pa. 279 ; Rowand v. Finney, 96 Pa. 196 ; Hartley's App., 103 Pa. 26 ; Thomas & Sons v. Loose, 114 Pa. 35 ; Phillips v. Meily, 106 Pa. 536 ; Real Est. T. Co.'s App., 125 Pa. 549 ; Eshelman's Est., 143 Pa. 24 ; Megargel v. Megargel, 105 Pa. 475.

*Frank P. Prichard*, for appellees.—The master having carefully considered the testimony of witnesses who were brought before him, his decision as to the questions of fact has the weight of a finding of a jury, and will not be overturned on appeal: Brotherton v. Reynolds, 164 Pa. 134.

PER CURIAM, January 25, 1897 :

A careful consideration of this record has led us to the conclusion that the court below was clearly right in dismissing the exceptions and confirming the master's report.    His findings of fact—so far at least as they are material to any of the questions involved in the specifications of error—were fully warranted by the evidence.    On the facts thus established by the learned master's findings and approval of the court, the decree is affirmed and appeal dismissed at plaintiff's costs.